2001 UT 93

**QUESTAR GAS COMPANY, Petitioner,**

v.

**UTAH PUBLIC SERVICE COMMISSION, Respondent.**

**No. 20000076.**

Supreme Court of Utah.

Oct. 23, 2001.

---

**220**

Gary G. Sackett, Jonathan M. Duke, Charles E. Greenhawt, Salt Lake City, for petitioner.

Mark L. Shurtleff, Att'y Gen., Michael Ginsberg, Douglas C. Tingey, Asst. Att'ys Gen., Sander J. Mooy, Salt Lake City, for respondent.

## INTRODUCTION

HOWE, Chief Justice:

¶ 1 Questar Gas Company ("Questar" or "the company") seeks review of the report and order issued by the Public Service Commission in docket number 98–057–12, denying Questar's application for (1) approval of an affiliate contract and (2) recovery through the company's 191 gas cost balancing account of gas processing costs incurred pursuant to that contract.

## BACKGROUND

¶ 2 During the mid to late 1990s, the heat value (measured in "Btu"s or "British thermal units") of natural gas entering the southern portion of Questar's distribution system began to decline. This decline created a significant safety hazard to the company's customers because natural gas appliances in homes and businesses can be operated safely only with gas containing a limited range of

per-volume Btu values.[1] The decline in Btu values was caused by an increase in the amount of carbon dioxide ("$CO_2$") in the gas being delivered to the southern point of Questar's system, which was mixing with the other gas in its system.

¶ 3 Questar met with the Public Service Commission ("Commission"), the Utah Division of Public Utilities ("Division"), and the Utah Committee of Consumer Services ("Committee") in January 1998 to explain this hazard and to explore ways to prevent it. Subsequent to the meeting, Questar continued to explore solutions to the problem. It decided that the quickest, surest, safest, and most economically efficient action was to remove enough $CO_2$ from the gas stream to bring it within safe heat value ranges before it entered the Company's system.

¶ 4 Questar entered into a contract with one of its affiliates to provide the removal services, which required the construction and operation of a processing plant.[2] In November 1998, Questar filed an application with the Commission for approval of the contract and for authorization to include the costs incurred pursuant to it in the Company's account 813, which in turn is included in the Company's account 191 of the Uniform System of Accounts,[3] or gas balancing account.[4]

¶ 5 The Division and the Committee opposed the application, and on December 3, 1999, the Commission denied it ("December 3 order"), concluding that Questar had not produced sufficient evidence to show the contract was prudent and that the costs could not be recovered through account 191 because they were not eligible for treatment under the "pass-through" statute, section 54–7–12(3)(d) of the Utah Code.[5] The Commis-

1. When the heat level of the gas delivered to these appliances drops below a certain Btu content, incomplete combustion and flame "lift off" produce higher levels of carbon monoxide, as well as appliance inefficiencies.

2. The contract provided for "cost-of-service pricing," which means the supplier provides goods and services at cost, including direct expenses, depreciation of assets, and a rate of return on the value of the assets.

3. The Commission has adopted the Uniform System of Accounts as set out in 18 C.F.R. § 201

(2001) as its uniform accounting system. *See* Utah Admin. Code R746–320–7 (1999).

4. Account 191 is a balancing account through which gas utilities in Utah can recover gas costs directly. We include a more detailed description of the account in the forthcoming analysis.

5. This section is so called because it authorizes a utility to seek reimbursement through utility rates of *certain identified fuel or energy costs* without having to pursue a lengthy general rate proceeding. Instead, this statute allows these

sion concluded the costs were not eligible for treatment under this statute. It held instead that the Company would have to seek relief in a general rate proceeding[6] or in an abbreviated proceeding as outlined in *Utah Department of Business Regulation v. Public Service Commission*, 614 P.2d 1242 (Utah 1980) ("Wage case").

¶ 6 Questar seeks review of the December 3 order, arguing that the Commission erred in refusing recovery of the $CO_2$ processing costs through account 191 because the Commission mistakenly tied account 191 to the pass-through statute. Questar agrees that the $CO_2$ costs do not qualify for treatment under the pass-through statute, but maintains that they are still recoverable through procedures specific to account 191. It argues that account 191 is not tied to the pass-through statute, but is instead a separate mechanism—with its own procedures—used to facilitate the transfer of certain unexpected costs on a dollar-for-dollar basis from the utility to its customer.[7]

## ANALYSIS

¶ 7 In reviewing whether the Commission correctly denied recovery of the Company's $CO_2$ processing costs through account 191, we must determine (1) whether, as the Commission urges, account 191 is simply an accounting tool to implement the results of a

costs to be "passed through" directly to ratepayers. *See* Utah Code Ann. § 54–7–12(3)(d) (1994).

6. A general rate proceeding is the Commission's primary mechanism for setting utility rates prospectively. In lengthy hearings, the Commission considers various factors, including the utility's historical income, cost and revenue data, and predictions of future costs and revenues, to arrive at a just and reasonable rate. *See Utah Dep't of Bus. Regulation v. Pub. Serv. Comm'n*, 720 P.2d 420, 420 (1986) ("EBA case").

7. Questar filed a general rate case, number 99–057–20, immediately following the December 3 order. The Commission issued its final decision in that case on August 11, 2000 ("August 11 order"), accepting a stipulation between Questar and the Division to allow a 68 percent recovery for processing costs beginning August 11, 2000. In accepting this stipulation, the Commission found that Questar's response to the $CO_2$ safety problem was reasonable and "yielded the required result." *In re Questar Gas Co.*, 203 P.U.R.4th 356, 2000 WL 1451221 (Utah Pub. Serv. Comm'n 2000). However, the Commission

statutory pass-through proceeding, or whether the account is a separate mechanism to change rates with its own set of procedures; and (2) if the latter, whether the Commission improperly refused to follow those procedures in reviewing Questar's application.

## I. ACCOUNT 191

### A. *Creation and Purpose*

¶ 8 The gas balancing account was approved by the Commission in the final report and order of No. 78–057–13 ("order" or "April 3 order"), and the language of this order describes its purpose and effect. In response to increasingly volatile fuel costs and a request by Mountain Fuel Company, the Commission created the account in 1979 "in order to pass through to consumers the legitimate costs of purchased gas and royalty costs" without incurring the time and expense of filing frequent rate change applications. Utah Pub. Serv. Comm'n, Rep. and Order, No. 78–057–13, at 4 (April 3, 1979).

¶ 9 A straightforward reading of the April 3 order reveals that the Commission did not intend for the balancing account to be "merely" an accounting tool, but created it as a more efficient interim rate-changing mechanism for recovering certain gas costs.[8] The operation of the account was

found that it was impossible to make a determination because the record was insufficient and could not be created. *See id.* We are left then to answer only the question of the procedure Questar should have followed to recover processing costs incurred between June 1999 and August 2000.

8. The Commission made the following findings and conclusions regarding the account in its order:

Under its current accounting practices, [the utility] must apply to this Commission for individual rate relief each time that it experiences an increase in the direct costs of acquiring natural gas supplies.... [The balancing account] would be used for the purpose of accounting for differences between actual gas costs incurred and the gas costs actually recovered through the utility's rates in effect....

An annual adjustment to rates to reflect the residual balance in the 191 Account, providing either a refund or a surcharge to customers' bills over the ensuing year, together with a

intended to replace more frequent rate relief requests by allowing the utility to record in *and recover through* the account certain costs [9] on a dollar-for-dollar basis without having to go through a lengthy rate-making process. This order anticipates that "rate changes [will be] made under [the account balance] proposal" and that such changes will be made pursuant to procedures that comply with statutory and regulatory requirements. Utah Pub. Serv. Comm'n, Rep. and Order, No. 78–057–13, at 5. However, the order does not tie the account to the pass-through statute, but merely states that the procedure to be followed would be "similar to that used in the current pass-through procedure." *Id.*

¶ 10 The Commission contends that this account has been used only in conjunction with and to implement rate changes made in a proceeding held pursuant to section 54–7–12(3)(d), the pass-through statute. Thus after finding that the $CO_2$ processing costs were not eligible for treatment under that section, the Commission concluded that Questar could not recover its costs through account 191. However, as we have just noted, the Commission, in the April 3 order, did not tie the balancing account to section 54–7–12(3)(d), but approved its creation to make rate changes pursuant to procedures that comply with statutory and regulatory requirements, some of which are "similar to [those] used in the current pass-through procedure." *Id.*

¶ 11 In addition to the Commission's intent as outlined in the April 3 order, the Commission's approval of the use of account 191 for purposes other than those authorized in section 54–7–12(3)(d) shows that the account can be and has been used apart from section 54–7–12(3)(d) proceedings. In 1981, the Commission approved a stipulation between Mountain Fuel Supply Company, Wexpro Company, the Division, the Committee, and the staff of the Wyoming Public Service Commission ("Wexpro agreement") that allowed Mountain Fuel to recover certain costs through account 191 that did not qualify for treatment under the pass-through statute. The Commission's approval of this stipulation is evidence that it has allowed the use of account 191 procedures for costs and revenues that did not qualify for pass-through treatment.[10] Thus we hold that the gas balancing account 191 and its attendant procedures need not be used only in conjunction with section 54–7–12(3)(d). Instead it is a separate rate-changing mechanism through which the Commission can set rates that are just, reasonable, and sufficient.

¶ 12 We presume, as we did in *Utah Department of Business Regulation v. Public Service Commission*, 720 P.2d 420 (Utah 1986), a case involving a similar type of account used by Utah Power and Light, that the Commission implemented this rate-changing mechanism under its "ample gener-

---

regular six-month adjustment to the base rate in a manner similar to that used in the current pass-through procedure, will provide a mechanism to carry out an accurate matching of gas costs with the costs collected in rates. . . .

Any unusual circumstance or one-time occurrence that would result in a serious interim mismatching of costs with rates before regularly scheduled adjustments are to take place could be dealt with on an ad hoc basis, by which either the Company or the Commission on its own motion could propose adjustments to rates in addition to the regular six-month adjustments.

. . . Any rate changes made under [this] proposal would be made only after a procedure that fully complies with existing statutory requirements and the Rules and Regulations of the Commission. . . .

[Approval of the balancing account proposal] constitutes a fair and equitable method for allowing [a utility] to recover in an accurate way the direct costs of its natural gas supplies.

Utah Pub. Serv. Comm'n, Rep. and Order, No. 78–057–13, at 3–6.

9. The costs that can be recorded in and recovered through the gas balancing account are recorded in the utility's tariff.

10. The Commission contends that the application of account 191 in the Wexpro agreement is distinguishable because it was "in the context of the Company's overall operations . . . in circumstances where it could consider the complete operations of the Company." However, whether the use of account 191 in the Wexpro case was in the context of overall operations is not germane to the issue of whether the account can be used apart from the pass-through statute. The fact remains that it was used outside the statute in this circumstance because it resulted in a rate that was just and reasonable and in the public interest. There is no reason the same result could not lie in this case.

al power to fix rates and establish accounting procedures." *Id.* at 424 n. 4; *see also* Utah Code Ann. § 54–4–1 (2000). We recognize that this power is not unlimited, and as we stated in the *EBA* case, the Commission has authority to set rates "only in general rate proceedings ... [and has] limited authority to permit interim rate changes which are necessary because of unexpected increases in certain specific types of costs." 720 P.2d 420 at 423. We have held that this limited authority can be used pursuant to the fuel cost pass-through legislation, *see id.*, and in an abbreviated rate case, *see Utah Dep't of Bus. Regulation v. Pub. Serv. Comm.*, 614 P.2d 1242 (Utah 1980). We add the 191 balancing account mechanism to the list today, noting that any rate established by the Commission in any one of these proceedings must be just, reasonable, and sufficient. Utah Code Ann. § 54–4–4 (2000).

### B. Procedure

¶ 13 The April 3 order anticipates an annual review of the balance of the account as well as a regular six-month adjustment review. It also anticipates that "[a]ny unusual circumstance or one-time occurrence that would result in a serious interim mismatching of costs with rates before regularly scheduled adjustments are to take place could be dealt with on an ad hoc basis." Utah Pub. Serv. Comm'n, Rep. and Order, No. 78–057–13, at 5.

¶ 14 As evidenced by the Commission's notices and orders, it has allowed Questar to use this account 191 mechanism to manage unexpected gas costs and revenues through refunds or surcharges to customers' bills. The Commission has either approved or denied the company's yearly applications containing a report of its use of account 191 following an informal proceeding wherein the

Commission has determined that resulting rates are "just, reasonable and cost justified" and where their approval is "in the public interest." *See, e.g.,* Utah Pub. Serv. Comm'n, Rep. and Order, No. 00–059–01 (June 26, 2000); Utah Pub. Serv. Comm'n, Rep. and Order, No. 99–059–01 (April 27, 1999); Utah Pub. Serv. Comm'n, Rep. and Order, No. 98–059–01 (October 5, 1998); Utah Pub. Serv. Comm'n, Rep. and Order, No. 93–059–01 (July 2, 1993).[11]

¶ 15 The Commission contends that it is unable to determine a just and reasonable rate by considering only the factors included in Questar's $CO_2$ application. However, the company's tariff describes which costs and revenues (including the accounts to which they are assigned) are to be included in the formula that determines the monthly accrual rate for account 191.[12] The Commission determined in the April 3 order that the balancing account complied with the laws of Utah and its own rules and regulations and that the 191 mechanism "constitutes a fair and equitable method for allowing [the utility] to recover in an accurate way the direct costs of its natural gas supplies." Utah Pub. Serv. Comm'n, Rep. and Order, No. 78–057–13, at 6. We presume that the Commission, in approving the company's tariff, considered whether it would result in a just and reasonable rate and was in the public interest. Thus, an application for balancing account approval that conforms to the above-described procedures and contains the appropriate costs and revenues as described in the company's tariff should result in just and reasonable rates.

## II. RATE PROCEEDINGS AND RATE-MAKING AUTHORITY

¶ 16 We have concluded that the balancing account was created as a rate-chang-

---

11. It is not clear from these orders whether the Commission has reviewed these yearly applications according to procedures set forth in the pass-through statute. Although the Commission declares in these orders that it reviews the applications pursuant to section 54–7–12, it does not specify subsection 3(d). However, it is clear from the Wexpro agreement that the Commission has allowed the use of account 191 to pass on costs and revenues in proceedings not related to section 54–7–12(3)(d).

12. This monthly rate is shown in the following formula: "Cost of Gas—(Commodity Cost Rate × total Utah Sales Volume)—(the sum for all Rate Classes of each Rate Class's Supplier Non-Gas Cost Rate × the sales Volume for that Rate Class)." The tariff then lists which accounts are included in each category of the formula. Account 813 is listed in the "Cost of Gas" category, and is thus correctly included in account 191.

ing mechanism with attendant procedures designed to ensure just and reasonable rates; we have also determined that it is not tied to the pass-through statute. We now turn to the question of whether the Commission was required to consider Questar's balancing account application according to the balancing account procedures. We hold that it was.

¶ 17 Section 63–46b–16 of the Utah Code authorizes this court to grant a petitioning party relief from an agency decision when the agency action is "contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency." Utah Code Ann. § 63–46b–16(4)(h)(iii) (1997).

■ ¶ 18 As we have just stated, the Commission created a procedure to enable utilities to recover increased fuel costs in the gas balancing account. Also, as we just noted, it has been the custom of the Commission to allow utilities, including Questar, to recover those costs through that procedure. In fact, according to Questar's tariff, Questar is *required* to record specified gas costs in its balancing account, account 191, which by definition is a rate-changing mechanism.[13] Thus, we conclude it has been the Commission's "prior practice" to enable Questar to recover specified costs through the balancing account procedure (as discussed above) as those costs are outlined in Questar's tariff. Because it has been the Commission's prior practice to enable Questar to recover gas costs through this procedure, the Commission's refusal to do so must be "justifie[d] by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency." *Id.*

¶ 19 The reason the Commission gave for refusing recovery of the $CO_2$ processing costs through the balancing account procedure was its unwillingness to "modify 191 Account pass-through proceedings to account for processing plant expenses." However, it is not entirely clear from the Commission's order how accounting for those expenses through account 191 would require modification of the proceedings. The Commission gave no indication that Questar's inclusion of the processing costs in account 813 was improper; it simply required Questar to "segregate" those costs with no rational explanation for its decision. To the extent the Commission's reasoning relies on a nexus between account 191 and the pass-through statute, we have already held that tie to be nonexistent, and thus the reasoning fails.

¶ 20 We therefore set aside the Commission's report and order and remand the case to the Commission for consideration of Questar's application in accordance with the procedures attendant to account 191 and in accordance with Questar's tariff. Again, we note that the company's tariff includes in account 191 those costs properly assigned to account 813. We direct the Commission in its account 191 review to render a decision on the merits concerning the inclusion of the $CO_2$ processing costs in account 813 and thus whether those costs are recoverable through account 191. If the Commission determines the $CO_2$ costs were improperly assigned to account 813 or denies the application for any other reason, it shall provide a rational basis for its decision.

¶ 21 Associate Chief Justice RUSSON, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Chief Justice HOWE's opinion.

---

13. This observation is significant because "[c]ourts have consistently held that tariffs have the force of law." *Mountain States Tel. & Tel. Co. v. Atkin, Wright & Miles, Chtd.,* 681 P.2d 1258, 1263 (Utah 1984); *see also Shehi v. South-western Bell Tel. Co.,* 382 F.2d 627, 629, n. 2 (10th Cir.1967) ("A tariff . . . is more than a mere contract—*'it is the Law.' "* (citations omitted)); *Atkin, Wright & Miles, Chtd. v. Mountain States Tel. & Tel. Co.,* 709 P.2d 330, 334 (Utah 1985).